# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued February 21, 2020            Decided October 27, 2020

No. 19-5021

HUASHAN ZHANG AND MASAYUKI HAGIWARA,
APPELLEES

v.

UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, ET
AL.,
APPELLANTS

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-00995)

*Christopher A. Bates*, Counsel to the Assistant Attorney General, U.S. Department of Justice, argued the cause for appellants. With him on the briefs were *Matthew J. Glover*, Counsel to the Assistant Attorney General, *Glenn M. Girdharry*, Assistant Director, and *Aaron S. Goldsmith*, Senior Litigation Counsel. *Joshua S. Press*, Attorney, entered an appearance.

*Ira Kurzban* argued the cause for appellees. With him on the brief was *John P. Pratt*.

Before: MILLETT, KATSAS, and RAO, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KATSAS.

KATSAS, *Circuit Judge*: Certain visas are available to prospective immigrants who invest capital in the United States. A longstanding regulation, promulgated in 1991, defines the required capital to include cash or indebtedness secured by the immigrant's assets. This appeal presents the question whether, under the regulation, the proceeds of a loan qualify as cash or indebtedness. We hold that loan proceeds qualify as cash, and we therefore affirm a decision affording relief to a class of foreign investors denied visas under a contrary interpretation adopted and announced by the government in 2015.

I

A

In 1990, Congress amended the Immigration and Nationality Act (INA) to establish the employment-based, fifth preference immigrant visa program, commonly known as the EB-5 visa program. *See* Immigration Act of 1990, Pub. L. No. 101-649, § 121(a), 104 Stat. 4978, 4987–90. This program provides "employment creation" visas to prospective immigrants seeking to engage in a new commercial enterprise in the United States. 8 U.S.C. § 1153(b)(5)(A). To qualify for such a visa, an applicant must have "invested" or be "actively in the process of investing" a minimum amount of "capital" in the new enterprise, which must create full-time jobs for at least ten qualifying workers. *Id.* In recent years, the minimum required investment has been either $1,000,000 or, if the investment was made in a targeted area, $500,000. *See id.* § 1153(b)(5)(C); 8 C.F.R. § 204.6(f) (2019). A targeted area is a rural area or one experiencing high employment. 8 U.S.C. § 1153(b)(5)(B)(ii).

In 1991, the Immigration and Naturalization Service (INS) promulgated implementing regulations for the EB-5 visa program. From then until 2019, the regulations defined the terms "capital" and "invest" as follows:

> *Capital* means cash, equipment, inventory, other tangible property, cash equivalents, and indebtedness secured by assets owned by the alien entrepreneur, provided that the alien entrepreneur is personally and primarily liable and that the assets of the new commercial enterprise upon which the petition is based are not used to secure any of the indebtedness.
>
> * * *
>
> *Invest* means to contribute capital. A contribution of capital in exchange for a note, bond, convertible debt, obligation, or any other debt arrangement between the alien entrepreneur and the new commercial enterprise does not constitute a contribution of capital for purposes of this part.

8 C.F.R. § 204.6(e) (2019).[1]

In 1998, the INS rendered precedential decisions applying these regulatory requirements to loans and promissory notes. One decision held that a loan from the investor to the enterprise does not qualify as an investment of capital. *Matter of Soffici*, 22 I. & N. Dec. 158, 162–63 (Assoc. Comm. 1998). A second decision explained that a promissory note from the investor to the enterprise may constitute either indebtedness or evidence that the investor is "in the process of investing other capital,

---

[1] In 2019, the definitions were amended to replace "entrepreneur" with "investor." *See* 8 C.F.R. § 204.6(e) (2020). That change is immaterial to the question presented.

such as cash." *Matter of Izummi*, 22 I. & N. Dec. 169, 193 (Assoc. Comm. 1998) (cleaned up). A third decision held that such a promissory note, to qualify as capital under the indebtedness prong of the definition, must be secured by assets amenable to seizure. *Matter of Hsuing*, 22 I. & N. Dec. 201, 202 (Assoc. Comm. 1998).

This case presents the further question of how the regulation treats the cash proceeds of a loan. The INS's successor agency, the United States Citizenship and Immigration Services (USCIS), addressed that question on a conference call with outside parties held on April 22, 2015. During that call, a deputy chief within the Immigrant Investor Program Office (IPO) of USCIS stated that, when a foreign investor invests cash from a loan in a new U.S. enterprise, USCIS treats the investment as indebtedness rather than cash. Thus, according to the deputy chief, "[p]roceeds from a loan may qualify as capital used for EB-5 investments, *provided that* the requirements placed upon indebtedness by 8 C.F.R. § 204.6(e) are satisfied." J.A. 42. In particular, the loan must be "secured by assets" owned by the foreign investor. *Id.*

B

The two plaintiffs in this case were denied EB-5 visas based on this interpretation of the regulation. One denial occurred shortly before USCIS publicly announced its position, and the other shortly after.

Masayuki Hagiwara is a Japanese citizen. In 2013, Hagiwara borrowed $500,000 from a corporation that he controlled and invested the money in a new commercial enterprise in Nevada, a targeted area. In 2014, Hagiwara filed what USCIS calls Form I-526, a petition to establish his eligibility for an EB-5 visa. In March 2015, USCIS denied the petition. It reasoned that the loan proceeds invested by

Hagiwara in the Nevada enterprise constituted indebtedness, not cash, under 8 C.F.R. § 204.6(e). USCIS then concluded that because the loan was not secured by Hagiwara's assets, his investment did not satisfy the regulatory requirements for indebtedness to qualify as capital.

The case of Huashan Zhang, a Chinese citizen, is similar. In 2013, Zhang borrowed $500,000 from a corporation that he controlled, invested the money in a new commercial enterprise in Nevada, and filed a Form I-526 petition. In May 2015, USCIS denied Zhang's petition on the same ground: the loan proceeds constituted indebtedness, which failed to qualify as capital because Zhang's assets did not secure the loan.

C

On June 23, 2015, Zhang and Hagiwara sued to challenge what they described as "USCIS's new collateralization rule." J.A. 20. The complaint raised four counts. First, the denial of the plaintiffs' petitions rested on an impermissible interpretation of the governing regulation. Second, USCIS impermissibly applied its new interpretation retroactively to applicants who made investments and filed Form I-526 petitions under the law as it existed before the April 22, 2015 announcement. Third, the denial of the plaintiffs' petitions violated the INA. Fourth, the position announced on April 22, 2015 was a legislative rule promulgated without notice-and-comment rulemaking.

Zhang and Hagiwara sought to represent a class of EB-5 investors who made investments and filed visa applications before the 2015 conference call. Specifically, they sought to represent a class defined as

> [a]ll Form I-526 petitioners who: (1) invested cash in
> a new commercial enterprise in an amount sufficient

to qualify as an EB-5 investor; (2) obtained some or all of the cash invested in the new commercial enterprise through a loan; (3) filed a Form I-526 petition prior to April 22, 2015 based on that investment; and (4) received or will receive a denial of their I-526 petition on the ground that the loan used to obtain the invested cash fails the collateralization test described in the announcement made by USCIS during its April 22, 2015 EB-5 stakeholder engagement.

J.A. 31. On behalf of the class, the plaintiffs sought to require USCIS to reopen applications that it had denied based on the collateralization rule, and to prohibit the agency from applying the rule to pending applications.

The plaintiffs moved for class certification, and the parties then filed cross-motions for summary judgment. The district court simultaneously resolved all these motions. *Zhang v. USCIS*, 344 F. Supp. 3d 32 (D.D.C. 2018).

As for summary judgment, the court held that the agency's interpretation of 8 C.F.R. § 204.6(e), as articulated in the 2015 conference call, was plainly erroneous and was a legislative rule improperly promulgated without notice-and-comment procedures. 344 F. Supp. 3d at 44–59. Having concluded that the agency's interpretation violated the regulation, the court did not reach the question whether it also violated the statute. *Id.* at 43. And having concluded that the 2015 interpretation could not be applied at all, the court did not reach the question whether its retroactive application was independently objectionable. *Id.*

The district court then certified a class under Federal Rule of Civil Procedure 23(b)(2). The court held that the class was ascertainable, that the claims of all class members arose from

the same course of conduct by USCIS, and that the relief sought by the class was indivisible. 344 F. Supp. 3d at 61–65. On its own motion, the court modified the proposed class definition in two respects. First, it eliminated the requirement that class members have filed their Form I-526 petitions before the 2015 conference call—a restriction that it thought made sense only as to the unreached retroactivity claim. *See id.* at 65–66. Second, the court required that each class member have filed a petition that was denied "solely" based on the agency's new position. *Id.* at 66. As a result of these changes, the certified class includes

> [a]ll Form I-526 petitioners who: (1) invested cash in a new commercial enterprise in an amount sufficient to qualify as an EB-5 investor; (2) obtained some or all of the cash invested in the new commercial enterprise through a loan; (3) filed a Form I-526 petition based on that investment; and (4) received or will receive a denial of their I-526 petition *solely* on the ground that the loan used to obtain the invested cash fails the collateralization test described in the USCIS 2015 IPO Remarks announcement.

*Id.* at 66.

Combining these rulings, the court vacated the denial of I-526 petitions filed by class members, and it remanded the case to USCIS for further consideration. 344 F. Supp. 3d at 60.

## II

We begin with the district court's summary-judgment rulings. Under the Administrative Procedure Act, a reviewing court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The question whether agency

action is arbitrary and capricious is a legal one generally made on the administrative record and resolved on summary judgment. *See*, *e.g.*, *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1277, 1282 (D.C. Cir. 2005). We review such a determination *de novo*. *Children's Hosp. Ass'n of Tex. v. Azar*, 933 F.3d 764, 769 (D.C. Cir. 2019).

A

The district court correctly concluded that loan proceeds qualify as cash, not indebtedness, under the EB-5 visa program. The INA makes these visas available to prospective immigrants who have "invested" or are actively "investing" a minimum amount of "capital" in a new United States enterprise. 8 U.S.C. § 1153(b)(5)(A)(i). Implementing regulations, promulgated by the INS when it was tasked with administering the EB-5 visa program, define these key terms. The parties assume, and we have no reason to doubt, that the regulatory definitions are reasonable and thus entitled to deference under *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842–45 (1984).

From 1991 through 2019, the regulation defined capital as "cash, equipment, inventory, other tangible property, cash equivalents, and indebtedness secured by assets owned by the alien entrepreneur, provided that the alien entrepreneur is personally and primarily liable and that the assets of the new commercial enterprise upon which the petition is based are not used to secure any of the indebtedness." 8 C.F.R. § 204.6(e) (2019). Whether USCIS properly denied Zhang's and Hagiwara's petitions turns on whether loan proceeds count as "cash," which automatically qualifies as capital, or as "indebtedness," which qualifies as capital only if it is secured by the foreign investor's assets. The regulation does not define the terms "cash" or "indebtedness," so we give them their

ordinary meaning. *See FTC v. Tarriff*, 584 F.3d 1088, 1090 (D.C. Cir. 2009).

Start with "cash." It means "[m]oney; in the form of coin, ready money." *Cash*, *Oxford English Dictionary* (2d ed. 1989). This definition easily encompasses loan proceeds. When a person takes out a loan, he receives money in exchange for a promise to repay the funds. And when that person uses the funds to purchase goods, he buys them with cash. Imagine someone wishes to sell a used car for payment "in cash only." If a buyer offered the cash proceeds of a loan, the seller would happily oblige, for the payment would be "in cash." Cash is fungible, and it passes from buyer to seller without imposing on the seller any of the buyer's obligations to his own creditors. The buyer's source of cash—whether paycheck, gift, or loan— makes no legal or practical difference. Here, when Zhang and Hagiwara took out loans from their companies, they received cash proceeds. And when they invested the proceeds into the Nevada enterprises, they gave and the enterprises received cash, plain and simple, regardless of how it was obtained.

Now consider "indebtedness." It means either "[t]he condition of being indebted or in debt" or "[t]he extent to which one is indebted; the sum owed; the actual debt." *Indebtedness*, *Oxford English Dictionary* (2d ed. 1989). Neither definition captures loan proceeds, which are the product of a debt, not the condition of being in debt or the debt itself. Moreover, eligibility for an EB-5 visa turns on whether capital is "invested" in the enterprise, 8 U.S.C. § 1153(b)(5)(A)(i), and to invest means "to contribute capital," 8 C.F.R. § 204.6(e). These provisions focus on the exchange between the foreign investor, who must invest the capital, and the new U.S. enterprise, which must receive the investment. They do not focus on any prior exchange between the investor and his source of funds, whether an employer, a bank, or a controlled

corporation. Moreover, the other kinds of capital listed in the regulation—cash, equipment, inventory, other tangible property, and cash equivalents—all become assets of the enterprise, which indicates that indebtedness must do the same. *See Beecham v. United States*, 511 U.S. 368, 371 (1994). But when the alien invests loan proceeds in an enterprise, the enterprise does not receive his indebtedness at all—much less receive it as an asset. Indebtedness thus does not include loan proceeds.

Instead, an investment of indebtedness is more naturally understood as a promise to give the enterprise something of value. When an investor gives the enterprise a promissory note, he incurs a liability—the "indebtedness" to the enterprise—and the enterprise can list the note as an asset on its balance sheet, just as it can list as assets the other kinds of capital described in the regulation. In this way, the indebtedness prong of the regulation implements the statutory provision extending EB-5 visa eligibility not only to any foreign investor who "has invested" the minimum amount of capital, but also to any foreign investor who "is actively in the process of investing" the capital. 8 U.S.C. § 1153(b)(5)(A)(i).

The structure of section 204.6(e) reinforces this conclusion. That provision separately addresses what types of assets qualify as capital and how the investor may acquire them. On the latter point, the regulation provides only that "[a]ssets acquired, directly or indirectly, by unlawful means (such as criminal activities) shall not be considered capital." By including this single limitation on how the investor may acquire capital, the regulation implicitly excludes other limitations. *See TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001). Whether cash is obtained from wages, a gift, or a loan makes no difference as to whether it qualifies as capital, so long as it has been lawfully acquired.

Another contextual clue buttresses our reading. To qualify as capital, an investment of indebtedness must be secured by the foreign investor's assets. 8 C.F.R. § 204.6(e). That makes sense for a promise to pay the enterprise: If the promise were unsecured, the enterprise would have no recourse in the event of a default. The enterprise then would receive no money and could create no jobs, frustrating the purpose of the EB-5 program. By contrast, this security requirement serves no purpose for loan proceeds. As noted above, when an alien obtains a loan and invests the proceeds in an enterprise, title to the cash passes unencumbered to the enterprise. As far as the enterprise is concerned, whether or how the investor's loan was secured makes no difference; it can deploy the cash either way, and it faces no exposure if the investor defaults on any obligation to a third-party lender.

In response, USCIS highlights the proviso that indebtedness, to qualify as capital, cannot be secured with the assets of the enterprise. 8 C.F.R. § 204.6(e). The agency says that this restriction would be pointless if indebtedness referred only to a promise to pay the enterprise, because the investor could not use the enterprise's assets to secure such a promise. But this type of arrangement is hardly far-fetched. To qualify for an EB-5 visa, a foreign investor must seek to engage in a "new commercial enterprise" and must make a substantial investment in it. 8 U.S.C. § 1153(b)(5)(A). The investor may well have control over the new enterprise, and potentially could use its assets to secure an ostensible promise to invest further capital. The restriction sensibly prohibits this kind of maneuvering, which would substantially reduce the benefit to the enterprise of the ostensible investment.[2]

---

[2] We recognize that similar concerns could arise if the alien obtained cash for his investment from a third-party loan secured by

USCIS further invokes 8 C.F.R. § 204.6(j), which sets forth the evidence that must accompany a Form I-526 petition. One subsection of that provision states that a petition "must be accompanied by evidence that the petitioner has placed the required amount of capital at risk for the purpose of generating a return." *Id.* § 204.6(j)(2). This showing "may include, but need not be limited to," five specific types of evidence. *Id.* One of these is "[e]vidence of any loan or mortgage agreement, promissory note, security agreement, or other evidence of borrowing which is secured by assets of the petitioner, other than those of the new commercial enterprise, and for which the petitioner is personally and primarily liable." *Id.* § 204.6(j)(2)(v). According to USCIS, the fact that the investor's "borrowing" was "secured" by his own assets would matter only if the definitional provisions treated proceeds of the borrowing as indebtedness.

This argument runs into several obstacles. For starters, the meaning of "capital" is controlled by the definition of that term in section 204.6(e), not by details in sub-subsections of the evidentiary rules that follow. *See Burgess v. United States*, 553 U.S. 124, 129 (2008) ("Statutory definitions control the meaning of statutory words … in the usual case.") (cleaned up);

---

assets of the enterprise. In that instance, even though the cash proceeds would qualify as capital, a question would arise whether the investor had adequately invested it. In defining "invest," section 204.6(e) states that a contribution "*in exchange for* a note, bond, convertible debt, obligation, or *any other debt arrangement* between the alien entrepreneur and the new commercial enterprise does not constitute a contribution of capital" (emphases added). If the enterprise pledges its assets as collateral, the investor's contribution may be "in exchange for" a disqualifying "debt arrangement" imposed on the enterprise. Because neither Zhang nor Hagiwara used assets of the enterprise to secure their respective loans, we need not resolve that question here.

*Whitman v. American Trucking Ass'n*, 531 U.S. 457, 468 (2001) (Congress "does not alter the fundamental details of a regulatory scheme in … ancillary provisions"). Under the governing definition, capital includes cash, which plainly encompasses the cash proceeds of a loan. Moreover, the evidentiary rules in section 204.6(j)(2) are by their terms non-exclusive; to prove the requisite capital investment, the petition "may include, but need not be limited to" the five categories of evidence. And the first of these categories is bank statements showing amounts deposited into the enterprise's accounts, 8 C.F.R. § 204.6(j)(2)(i), which would show loan proceeds so deposited. Finally, our understanding of indebtedness, referencing the alien's promise to invest in the enterprise, does not make it pointless to consider whether the investor's borrowing was secured by his own assets. In assessing large loans taken out by foreign investors, security arrangements might help confirm that the loans are legitimate. For an investor still in the process of investing, that consideration bears on whether the enterprise ultimately will receive the loan proceeds. And in all cases, the *bona fides* of a loan tend to show that its proceeds were lawfully acquired—an independent requirement for any asset to qualify as capital. 8 C.F.R. § 204.6(e). Taken as a whole, the evidentiary provisions of section 204.6(j) do not undercut our conclusion that the "cash" referred to in section 204.6(e) includes loan proceeds.

USCIS also advances several policy arguments. According to the agency, if the proceeds of unsecured loans qualified as capital, then wealthy third parties could buy visas for foreigners unlikely to create jobs, and foreign investors could qualify for visas by investing domestic funds. The plaintiffs respond that the statute sets forth requirements for the enterprise (not the investor) to create jobs, and it does not prohibit investments (secured or otherwise) involving the U.S. funds of foreign investors. We need not engage these

arguments, for we cannot disregard the plain meaning of a regulation based on policy considerations. *Mercy Hosp., Inc. v. Azar*, 891 F.3d 1062, 1070 (D.C. Cir. 2018). Likewise, given the clarity of the governing regulation, we cannot defer to the agency's contrary interpretation. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019).

Text, structure, and regulatory context show that the term "cash," as used in 8 C.F.R. § 204.6(e), unambiguously includes the proceeds of third-party loans. Because USCIS's contrary construction is impermissible, we affirm the district court's decision to set aside the denial of the plaintiffs' petitions.

B

The district court further held that USCIS's interpretation of its own regulation, as announced in the April 2015 conference call, constituted a legislative rule requiring notice-and-comment rulemaking. USCIS contends that the announcement was not final agency action at all, and thus was unreviewable, or at most was an interpretive rule.

We need not attempt to categorize the April 2015 comments, for nothing would turn on it. USCIS wisely does not argue that telephone statements made by its IPO deputy chief were intended to change, or could change, a binding regulation published by a predecessor agency in the Code of Federal Regulations. Instead, the agency defends the statements as a permissible interpretation of the regulation and as a reiteration of its prior position. But whether the statements have no independent legal effect by design or because they were improperly adopted makes no difference. In either event, the regulation itself—not a statement made by an agency official on a conference call—governs the question of what constitutes a capital investment under the INA. We thus need

not consider whether the statements amounted to an improperly promulgated legislative rule or something less binding.

Likewise, we need not consider whether those statements amounted to an interpretive rule or to non-final agency action. The question whether agency action is final and thus reviewable under the APA is not jurisdictional, *Flytenow, Inc. v. FAA*, 808 F.3d 882, 888 (D.C. Cir. 2015), so we need not decide it first. And we have already held that 8 C.F.R. § 204.6(e) unambiguously forecloses the position expressed by the deputy chief in the conference call. Thus, nothing turns on whether that position reflects an interpretive rule that does not warrant deference under *Kisor* or simply informal and unreviewable agency advice.

Regardless of how the comments are characterized, we affirm the district court's conclusion that they are inconsistent with the regulation and thus can have no legal effect.

III

After rejecting USCIS's interpretation of 8 C.F.R. § 204.6(e), the district court turned to class certification. The court certified a class of all Form I-526 petitioners who invested the cash proceeds of loans in new commercial enterprises and had their petitions denied "*solely* on the ground that the loan used to obtain the invested cash fails the collateralization test described in the USCIS 2015 IPO Remarks announcement." 344 F. Supp. 3d at 66. For all such investors, the court vacated the denials and remanded to USCIS for further consideration. *Id.*

On appeal, USCIS raises one objection to the class certification: that the class is overbroad insofar as it sweeps in investors whose petitions were denied as far back as 1991. As USCIS explains, the statute of limitations for claims against the

federal government is six years, 28 U.S.C. § 2401, and the complaint in this case was filed on June 23, 2015. The claims of investors whose petitions were denied before June 23, 2009 thus are time-barred. USCIS invokes the rule that a certification order may neither revive time-barred claims nor include individuals with such claims in the class. *See*, *e.g.*, *Doe v. Chao*, 306 F.3d 170, 184 (4th Cir. 2002), *aff'd on other grounds*, 540 U.S. 614 (2004); *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 344 (4th Cir. 1998); *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 246 (3d Cir. 1975). Further, USCIS continues, ascertaining which Form I-526 petitioners are in this class would impose an unreasonable burden involving a manual review of over 11,000 files going back some three decades.

We are troubled by USCIS's failure to raise this argument before the district court and to afford that court the opportunity to address it in the first instance. At no point after the district court certified the class did USCIS voice its current objection. It did not raise this concern in a motion for clarification or reconsideration of the certification order, in a motion to amend the judgment under Federal Rule of Civil Procedure 59(e), or in its motion for a partial stay. Ordinarily, the failure to raise an issue below would result in a forfeiture. *See*, *e.g.*, *Trudel v. SunTrust Bank*, 924 F.3d 1281, 1285 (D.C. Cir. 2019).

But we need not address forfeiture in this case, for we see no indication that the district court included time-barred claimants in the certified class. Nothing in the court's thorough opinion indicates that it was doing so, despite the settled law noted above. Quite the opposite, the district court recognized and applied the six-year statute of limitations in concluding that the notice-and-comment claims were timely. USCIS had argued that the plaintiffs were making a time-barred challenge to the adoption of section 204.6(e) in 1991. The court rejected

that contention, not because it thought the plaintiffs could use class certification to challenge agency actions that occurred decades ago, but because it viewed the notice-and-comment claims as focused on "USCIS's interpretation of the regulation" as "announced … on April 22, 2015." 344 F. Supp. 3d at 57. The court thus concluded that the claims were filed "well within the applicable six-year statute of limitations." *Id.* It also explained why older actions by USCIS or INS, such as the precedential 1998 decisions, provided no support for the 2015 position. *See id.* at 53–55. Finally, the court modified the proposed class definition to require that denials be based "solely" on the 2015 position, thus emphasizing the need for a tight connection between it and any individual denials. *See id.* at 66. For these reasons, denials based solely on "the collateralization test described in the USCIS 2015 IPO Remarks announcement," *id.*, cannot fairly be understood as including denials made outside the limitations period.

The plaintiffs' own arguments reinforce this conclusion. At every turn, the plaintiffs characterized the position taken by USCIS in April 2015 as a bolt out of the blue—a new position representing a sharp break from past agency practice. The complaint alleged that "class members were blindsided" by a new rule announced and applied "only *after* they made their investments and filed their Form I-526 petitions." J.A. 31. The retroactivity and notice-and-comment counts, which focused on the April 2015 conference call as opposed to individual denials, rested centrally on the proposition that the agency had announced an unexpected new rule. J.A. 36 ("At the time Plaintiffs invested capital in a new commercial enterprise and submitted their Form I-526 petitions, Defendants treated the investment of cash proceeds from a third-party loan as *cash*, not 'indebtedness.' Defendants abruptly departed from this policy in adopting their collateralization rule and applying it retroactively to pending petitions like Plaintiffs.'"); J.A. 38

18

("Defendants' collateralization rule, public[ly] announced for the first time on April 22, 2015, is a rule of general applicability that carries the force of law."). The plaintiffs' class-certification and summary-judgment motions repeatedly made similar characterizations. None of this suggested any challenge to agency actions more than six years before the complaint was filed, much less to agency actions some three decades earlier.

We recognize that USCIS expressed a different view as to the novelty of its 2015 position. USCIS claimed that the comments made in the April 2015 conference call, as well as its orders denying the petitions of Zhang and Hagiwara, reflect a consistent agency position dating back at least to the 1998 INS decisions. But the plaintiffs are the masters of their own complaint, which focused entirely on assertedly novel agency actions undertaken in 2015. And the district court correctly rejected USCIS's contention that its present position was supported by any past agency action. *See* 344 F. Supp. 3d at 53–55.[3]

We also recognize some fuzziness in determining which denials can fairly be tied to "the collateralization test described in the USCIS 2015 IPO Remarks announcement." The class must encompass some denials that occurred before the April

---

[3] None of the 1998 precedential decisions supports USCIS's current position. *Soffici* held that a loan to the enterprise, whether from the foreign investor or a third party, does not qualify as an investment of capital. *See* 22 I. & N. Dec. at 162–63. That case does not speak to whether loan proceeds constitute cash or indebtedness. *Izummi* and *Hsuing* both recognized that a promissory note from the investor to the enterprise, if secured by the investor's assets, can constitute an investment of indebtedness. *See Izummi*, 22 I. & N. Dec. at 192–93; *Hsuing*, 22 I. & N. Dec. at 202. Those cases support our conclusion that indebtedness under the regulation means a promissory note as opposed to the cash proceeds of a loan.

2015 conference call, for Hagiwara's petition was denied in March 2015, and he is a class representative. But on appeal, USCIS rests its entire argument on the purported inclusion in the class of investors whose claims are time-barred. USCIS does not make any independent argument that the class, if limited to plaintiffs with timely claims, is not sufficiently ascertainable. To reject USCIS's position, we thus need only conclude that the class does not include investors whose petitions were denied before June 23, 2009.

Finally, we reserve the question whether class certification under Rule 23(b)(2) is appropriate when an agency denies benefits in many individual adjudications resting on a common legal rationale. Rule 23(b)(2) permits certification if the defendant has acted "on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." The appropriate relief must be "indivisible," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011), as it is in the paradigmatic case of a school desegregation injunction, *see* Fed. R. Civ. P. 23(b)(2) advisory committee's note to 1966 amendment. USCIS does not raise the question whether these requirements are satisfied in cases like this one. Accordingly, we simply note the point for consideration in a future case.

## IV

The district court correctly rejected USCIS's interpretation of 8 C.F.R. § 204.6(e), and it did not improperly sweep into the class investors whose challenges to their visa denials are time-barred.

*Affirmed.*