# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 1, 2020                    Decided July 13, 2021

No. 19-5357

GERALD LEE FARRELL,
APPELLANT

v.

ANTONY BLINKEN, SECRETARY OF STATE, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-00490)

*Bradley Banias* argued the cause and filed the briefs for appellant.

*P. Angel Martinez*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Joseph H. Hunt*, Assistant Attorney General, *William C. Peachey*, Director, and *Yamileth Davila*, Assistant Director.

Before: KATSAS, RAO and WALKER, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* RAO.

Dissenting opinion filed by *Circuit Judge* KATSAS.

RAO, *Circuit Judge*: While United States citizenship is one of the most sought after in the world, American citizens sometimes choose to relinquish this privilege and place their allegiance elsewhere. Congress has specified the actions that will result in expatriation and also vested authority in the Secretary of State to recognize the loss of nationality. Before recognizing a person's expatriation, the Department of State (the "Department") requires citizens to comply with various procedures. If it is satisfied that expatriation has occurred, the Department will issue a certificate of loss of nationality ("CLN"). This case involves a challenge to the procedures for obtaining a CLN. Gerald Farrell claims that he has performed an expatriating act by naturalizing as a Swiss citizen with the intent to relinquish his United States citizenship. The Department denied Farrell's request for a CLN because he has not appeared at a consulate abroad to fill out forms that, according to the Department, must be completed in person to obtain a CLN. Farrell challenges this "in-person requirement," arguing that it is contrary to law, ultra vires, and arbitrary and capricious. The district court upheld the in-person requirement.

We first explain the basis of Farrell's standing and our jurisdiction to decide this case. On the merits, we agree with the district court that the Department has statutory authority to impose an in-person requirement; however, we hold the Department acted arbitrarily and capriciously in denying Farrell a CLN. In a series of letter responses to Farrell's request for a CLN, the Department offered conflicting and ever-evolving reasons for denying the CLN and failed to explain what tasks Farrell was required to complete in person. We thus reverse and remand to the district court with instructions to remand to the Department to reconsider Farrell's request for a CLN.

I.

Farrell enjoyed U.S. citizenship by virtue of his birth in Santa Clara, California. In 1994 he moved to Switzerland, where he married a Swiss citizen and had a child. In 2004, he naturalized as a Swiss citizen, allegedly with the intent of relinquishing his United States nationality pursuant to 8 U.S.C. § 1481(a)(1). Section 1481(a) lists various acts by which a United States national can expatriate. One such expatriating act is "voluntarily … with the intention of relinquishing United States nationality … obtaining naturalization in a foreign state." *Id*. § 1481(a)–(a)(1). Farrell claims that he possessed the requisite intent and cites as evidence that for almost ten years following his naturalization in Switzerland, he made no use of his U.S. citizenship and did not step foot in the United States. In 2013, however, Farrell was arrested in Spain while on vacation with his family and extradited to stand trial in the United States for the crimes of interstate travel with intent to engage in sex with a minor and possession of child pornography, which he committed ten years earlier in the United States. He pleaded guilty and was sentenced to ninety-six months' imprisonment in the United States. *See* Judgment at 1–2, *United States v. Farrell*, No. 1:04-cr-00180 (D. Idaho June 25, 2014), ECF No. 48.

While imprisoned, Farrell corresponded with the State Department, requesting a certificate of loss of nationality to recognize that he had lost his U.S. nationality when he naturalized in Switzerland. First, Farrell sent a letter to the U.S. Ambassador in Switzerland, asking that she review Farrell's citizenship and issue him a CLN. Farrell explained that he sought a CLN under Section 1481(a)(1) because he naturalized in Switzerland with the intent to relinquish U.S. nationality. The Embassy replied with information about a loss of nationality under Section 1481(a)(5). But Farrell was not

pursuing loss of nationality under that section, which permits expatriation by "making a formal renunciation of nationality before a diplomatic or consular officer of the United States in a foreign state." 8 U.S.C. § 1481(a)(5).

Farrell again wrote to the Ambassador, reiterating that his request fell under Section 1481(a)(1). The Embassy responded and explained the process for obtaining a CLN under Section 1481(a)(1): It advised that if Farrell wished to obtain a CLN, "he would have to come to the Embassy in Bern to sign form DS-4081 'Statement of Understanding' in person in front of a consular officer." J.A. 131. Before it issues a CLN, the Department requires CLN applicants to complete Form DS-4081, which attests to an understanding of the irrevocable consequences of losing U.S. citizenship. *See* U.S. Dep't of State, 7 Foreign Affairs Manual § 1212(a)(4); *id.* § 1227(a)(4). The Department also requires the completion of Form DS-4079, which asks questions about the nature of the CLN applicant's expatriating act. *See id.* § 1212(a)(1), (b)(1); *id.* § 1224.3(a)(2). These procedural requirements, the Department explained, are designed so the consular officer may "determine whether the expatriating act was performed voluntarily and with the intent to relinquish U.S. citizenship." J.A. 175.

In a third round of correspondence, Farrell argued that he had already committed the expatriating act in 2004, when he naturalized in Switzerland, and was now attesting that he did so voluntarily with the intent to lose his nationality, so the Department should simply issue the CLN recognizing as much. The Embassy responded and explained that pursuant to 8 U.S.C. § 1483, Farrell could not lose his citizenship while he was in the United States, so the Department could not issue him a CLN while he was imprisoned in the United States. Farrell replied, repeating his now-familiar arguments that he had

already expatriated when he naturalized in Switzerland and thus was entitled to a CLN.

Farrell next contacted the Bureau of Consular Affairs in Washington, D.C. In response, the Bureau explained that loss of citizenship becomes effective when a CLN is issued, not upon commission of the expatriating act, and that Farrell had not signed "the required Department of State forms before a consular officer" to obtain a CLN. J.A. 152. In response to another letter from Farrell, the Bureau again rebuffed his CLN request, but provided more specific directions that "[t]he process for obtaining a CLN … includes the individual signing the DS-4079 before a consular officer at post abroad, and completing an interview with a consular officer to determine whether the expatriating act was performed voluntarily and with the intent to relinquish U.S. citizenship." J.A. 175.

After this back and forth that ranged from May 2016 to February 2017, Farrell sued the Department in the U.S. District Court for the District of Columbia. He claimed that the Department was unlawfully denying him a CLN because the in-person requirement is contrary to statute, ultra vires, and arbitrary and capricious. He sought, among other requested relief, an order that the Department issue him a CLN. The district court granted summary judgment to the Department, holding that the Department's denial of a CLN based on Farrell's failure to appear in person was valid. *Farrell v. Pompeo*, 424 F. Supp. 3d 1 (D.D.C. 2019). The district court concluded that the Secretary of State's authority to create procedural rules regarding CLNs provided statutory authorization for an in-person requirement. *See id.* at 17–18 (relying on 8 U.S.C. § 1104(a)). Although the Department had offered scant explanation for its in-person requirement, the district court found its rationale reasonably discernible: The "in-person appearance requirement seeks to ensure that an

applicant understands the consequences of loss of nationality," and thus that the applicant performed the expatriating act with the requisite intent. *Id.* at 19. The district court held that the requirement is not arbitrary and capricious. *Id.* at 21.

This timely appeal followed. While this case was on appeal, Farrell was released from prison and returned to Switzerland.

## II.

Although no party disputes Farrell's standing, the absence of standing is a defect in this court's subject matter jurisdiction that we have an obligation to consider at the outset. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88–89 (1998). "[T]he irreducible constitutional minimum of standing" consists of three familiar elements. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The plaintiff must have suffered an injury in fact that is concrete, particularized, and actual or imminent; the injury must be causally connected to the conduct that the plaintiff is complaining of; and it must be likely that a favorable decision of the court will redress the injury. *Id.* at 560–61; *see also Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) ("Particularization is necessary to establish injury in fact, but it is not sufficient. An injury in fact must also be 'concrete.'").

Farrell asserts that his Swiss naturalization, taken with the intent to expatriate, caused him to lose his citizenship. The State Department, however, maintains that "an individual … remains a U.S. national until the Department's approval of a CLN." State Dep't Br. 18. The question of injury here is whether the government's insistence that Farrell remains a citizen injures Farrell after he has taken the expatriating act of becoming a Swiss citizen and relinquishing his American citizenship. We conclude that we have

jurisdiction to decide this appeal because the Department's failure to recognize Farrell's alleged expatriation inflicts a concrete injury on his statutory right to expatriate. The government continues to claim Farrell as a citizen, which prevents him from disassociating from the United States until the Secretary of State recognizes his loss of nationality.

To begin with, Farrell has a statutory right to expatriate. In 1868, Congress recognized that "the right of expatriation is a natural and inherent right of all people, indispensable to the enjoyment of the rights of life, liberty, and the pursuit of happiness." Act of July 27, 1868, ch. 249, 15 Stat. 223, 223. As a consequence of this right, Congress provided "[t]hat any declaration, instruction, opinion, order, or decision of any officers of this government which denies, restricts, impairs, or questions the right of expatriation, is … inconsistent with the fundamental principles of this government." *Id.* at 224. The Supreme Court has also recognized a citizen's statutory right to expatriate. *See Mandoli v. Acheson*, 344 U.S. 133, 135–37 (1952) (discussing statutes Congress enacted to effectuate "the individual's right to expatriate," of which the United States "became champion … [and] for which it contended in diplomacy and fought by land and by sea").

Consistent with this right, the Immigration and Nationality Act specifies several mechanisms for individuals to expatriate. Performance of any of the listed acts will cause a person to "lose his nationality." 8 U.S.C. § 1481(a); *see also id.* § 1488 ("The loss of nationality under this part shall result solely from the performance by a national of the acts … specified in this part."). Moreover, the statute instructs consular officers to begin the CLN process "whenever" they "ha[ve] reason to believe that a person while in a foreign state *has lost* his United States nationality." *Id.* § 1501 (emphasis added). We have previously noted "Congress's determination that United States

citizenship may be lost automatically, without any administrative or judicial determination." *United States v. Yakou*, 428 F.3d 241, 249 (D.C. Cir. 2005). Congress has also, however, created a mechanism whereby the government will recognize when a citizen has expatriated. 8 U.S.C. § 1501 ("Approval [of a CLN] shall constitute a final administrative determination of loss of United States nationality.").

Here, Farrell has exercised his right to expatriate by taking an expatriating action. But the government maintains that because it has not recognized Farrell's expatriation, he *officially* remains a U.S. citizen, a forced association that constitutes a concrete and particularized injury sufficient to maintain Article III standing.

Under our precedent, the government's failure to recognize expatriation constitutes an injury in fact. In *Schnitzler v. United States*, a South Dakota prisoner sought to renounce his citizenship. 761 F.3d 33, 39 (D.C. Cir. 2014). We explained that Schnitzler sought "official acknowledgement of his renunciation." *Id.* at 35; *see also id.* at 37 (noting that Schnitzler was pursuing "an effective or practical way to renounce his citizenship, as well as the government's recognition of that renunciation") (cleaned up). Importantly, we held that "being required to continue his association with the United States against his wishes" constituted an injury in fact for the purposes of standing. *Id.* at 40.

*Schnitzler* governs the standing inquiry in this case. Like Farrell, Schnitzler also claimed to have already expatriated. *Id.* at 36. In his complaint, Schnitzler requested the following relief: "Simply – I want the United States of America to *recognize* that I am not a United States citizen"; and he pled that he had acquired a "new status" as a noncitizen. Compl., *Schnitzler v. United States*, No. 1:11-cv-01318-RBW, at 5 (D.D.C. July 20, 2011), ECF No. 1 (emphasis added). We

explicitly held Schnitzler had standing, reversing a district court decision that, like the dissent, would have required Schnitzler to allege harms in addition to "still [being] considered a United States citizen" against his wishes.[1] *Schnitzler*, 761 F.3d at 40 (citing 863 F. Supp. 2d 1, 4 (D.D.C. 2012)); *see also Fox v. Clinton*, 684 F.3d 67 (D.C. Cir. 2012); *Weber v. U.S. Dep't of State*, 885 F. Supp. 2d 46 (D.D.C. 2012).

In this case, Farrell similarly suffers a cognizable injury because the government is withholding official recognition of his claimed expatriation. The State Department plainly represents in these proceedings that it considers Farrell a U.S. citizen because he has not obtained a CLN. *See* State Dep't Br. 18 ("[A]n individual effectively remains a U.S. national until the Department's approval of a CLN."); Oral Arg. Tr. 25 ("It's incorrect for Mr. Farrell to say that he's no longer a citizen. We do not acknowledge that.").[2]

---

[1] *Schnitzler* is binding precedent that the dissent is unable to distinguish. Contrary to the dissent's assertions, both Schnitzler and Farrell challenged the government's refusal to recognize a past expatriation. Dissenting Op. 15–16. And our decision in *Schnitzler* repeatedly cited the recognition element of Schnitzler's allegations. 761 F.3d at 36, 37, 38.

[2] The government has taken the position that a CLN is necessary for "effective" expatriation in other cases as well. *See Duncan v. U.S. Dep't of State*, 2008 WL 4821323, at *1 (W.D. Va. Oct. 30, 2008) (recounting the Department's position that a CLN is necessary "to achieve effective renunciation of citizenship"); *see also* U.S. Dep't of State, 7 Foreign Affairs Manual § 1200 app. A at § 1290(d) ("The principle that a country shall determine who is a national of that country for purposes of their domestic law is a concept universally recognized under international law."). That the government has sometimes formally recognized expatriation through mechanisms other than CLNs, Dissenting Op. 12–13, does not lessen Farrell's

Even if Farrell has already completed an expatriating act, he remains a citizen until the government recognizes that he has expatriated. In other words, if a man renounces his citizenship alone in the forest, and the government is not around to hear it, he remains a citizen. Because citizenship is a reciprocal relationship between a person and the state, recognition of expatriation is inextricably bound with expatriation.[3]

Farrell has standing because he has suffered "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560). Farrell has a legally protected interest in expatriation. He has been effectively denied his statutory right

---

interest in completing his expatriation with *some* official recognition, which he is pursuing here via obtaining a CLN. In any event, the government has represented that obtaining a CLN is the only mechanism by which Farrell can have his expatriation recognized.

[3] *See, e.g.*, William Thomas Worster, *Human Rights Law and the Taxation Consequences for Renouncing Citizenship*, 62 St. Louis U. L.J. 85, 97 (2017) (listing regimes such as Iran, North Korea, and Syria as those that "mak[e] the approval process [for expatriation] almost impossible," thereby casting doubt on the existence of the right to expatriate in those countries); *see also* Patrick Weil & Nicholas Handler, *Revocation of Citizenship & Rule of Law: How Judicial Review Defeated Britain's First Denaturalization Regime*, 36 L. & Hist. 295, 300 (2018) ("Dual nationality developed in part because many countries refused to recognize the right to renounce one's native-born citizenship."); Annual Message of President Ulysses S. Grant (Dec. 7, 1874), *in* 3 JOHN BASSETT MOORE, A DIGEST OF INTERNATIONAL LAW 713 (1906) ("The importance of such definition" as to "when a citizen shall be *deemed* to have renounced or to have lost his citizenship … is obvious.") (emphasis added).

to expatriate because the government has not agreed to sever the citizenship relationship.

The dissent focuses on whether Farrell has a right to a CLN, but the central issue is the right to expatriate, which the government has determined Farrell may not exercise without recognition through a CLN. The dissent protests that the government's failure to recognize Farrell's expatriation is insufficient "absent any threat that the government will seek to enforce some law against Farrell." Dissenting Op. 14. Such an argument is untenable in light of *Schnitzler*. The dissent also maintains that under the INA an individual has the right to expatriate without the government's approval or official recognition. Dissenting Op. 9, 12–14. That is true, but does not undermine the harm suffered when the Executive Branch refuses to allow the expatriation to occur on the terms provided by Congress. Farrell does not seek an abstract declaration of his status, but rather the effectuation of his statutory right to expatriate.

The injury here is unquestionably particular to Farrell—it is his citizenship status. The injury is also concrete—Farrell remains a de facto U.S. citizen. Like most U.S. citizens, we consider American citizenship a blessing, not a harm. Farrell, however, seeks to relinquish his nationality. Remaining a citizen is an injury that "actually exist[s]" because the government steadfastly maintains that, irrespective of his expatriating actions, Farrell is still a U.S. citizen. *Spokeo*, 136 S. Ct. at 1548. Farrell seeks to vindicate his right to give up his U.S. citizenship and asserts the violation of a private statutory right, a type of harm ordinarily presumed to constitute an injury in fact. *Cf. id.* at 1551 (Thomas, J., concurring) ("In a suit for the violation of a private right, courts historically presumed that the plaintiff suffered a *de facto* injury merely from having his personal, legal rights invaded."). As the Supreme Court has

recognized, a concrete injury may be "intangible," and "the risk of real harm" can satisfy the requirement of concreteness. *Id.* at 1549 (majority opinion). The reasoning in *Spokeo* is entirely consistent with our conclusion in *Schnitzler* that "being required to remain in citizenship status" against one's will constitutes an injury in fact. 761 F.3d at 40.

If there were any doubt about the concrete consequences of the government's position, one need look no further than the fact that, years after Farrell claims to have expatriated, the government issued him a passport, had him extradited to the United States, and convicted him of a criminal offense. Farrell's claimed expatriation was no barrier to the U.S. government's asserting sovereignty over him, which demonstrates just one way in which official recognition is a legal and practical necessity to exercise the right to expatriate.

Without the government's recognition of loss of nationality, the full force of the United States government may be brought to bear upon a citizen.[4] The citizenship relationship is not completely severed until the government recognizes Farrell's expatriation. Withholding recognition of expatriation

---

[4] When the government hangs on to a citizen, that frustrates the right to expatriate and imposes the ongoing control of the U.S. government. *See Talbot v. Janson*, 3 U.S. (3 Dall.) 133, 162 (1795) (opinion of Iredell, J.) (Expatriation is not a matter "in which the individual is to be considered as alone concerned. As every man is entitled to claim rights in society … he, in his turn, is under a solemn obligation to discharge all those duties faithfully, which he owes, as a citizen, to the society of which he is a member."); *Collins v. Weinberger*, 707 F.2d 1518, 1522–23 (D.C. Cir. 1983) ("The benefits and burdens of being a U.S. citizen … constitute a complex package.").

denies Farrell his statutory right to expatriate in a concrete, personal way. *See Spokeo*, 136 S. Ct. at 1547–50.

The dissent contends that Farrell lacks a sufficiently concrete interest in recognition of his expatriation and looks to history to suggest that this claim lacks a basis in Anglo-American law. *See* Dissenting Op. 5–8. While Congress has no power to erase Article III requirements by statute, here it has codified a private right to expatriate and created mechanisms for exercising that right. The statutory right to expatriate in the 1868 Act as well as in the INA reflects a longstanding recognition that such a right is rooted in natural law and the principle of consensual government at the heart of our constitutional republic.

Courts in the late eighteenth century identified a right to expatriate. As Justice Iredell explained, "the writers on the law of nations … plainly mean … that [expatriation] is a reasonable and moral right which every man ought to be allowed to exercise." *Talbot v. Janson*, 3 U.S. (3 Dall.) 133, 163 (1795) (opinion of Iredell, J.); *see also id.* at 169 (opinion of Cushing, J.) (describing "the important right of expatriation"). The right to expatriate was also recognized by some state courts, one of which expressly held that the consent of the sovereign was unnecessary. *See Alsberry v. Hawkins*, 39 Ky. (9 Dana) 177, 178 (1839) ("[A]llegiance, in these United States, whether local or national, is, in our judgment, altogether conventional, and may be repudiated by the native as well as adopted citizen, with the presumed concurrence of the government, without its formal or express sanction.") (cleaned up); *see also Delacroix v. Boisblanc*, 4 Mart. (o.s.) 715, 716 (La. 1817) ("That all men have a right to expatriate, at least when by such removal they cause no prejudice to the community of which they were members, is not questionable in a free country.").

The Supreme Court has recognized a similar "right to election," which allowed those living in the nascent United States after the Revolution to determine where to place their allegiance. *M'Ilvaine v. Coxe's Lessee*, 8 U.S. (4 Cranch) 209, 213 (1808); *see also Inglis v. Trustees of Sailor's Snug Harbour*, 28 U.S. (3 Pet.) 99, 124 (1830) (*M'Ilvaine* "recognized fully the right of election."). And the United States has repeatedly recognized a right of election when acquiring new territory.[5] Importantly, where "no special laws [governing election] were passed," that left "each case … to be decided upon its own circumstances." *Inglis*, 28 U.S. at 160 (opinion of Story, J.). In other words, common law courts not only decided cases raising the right to election, they formulated rules to effectuate that right. *See id.* (citing cases). Exercising the right of election also sometimes involved following formal processes to ensure the government knew of the election.[6] This offers "a close historical or common-law analogue" for the

---

[5] *See* Treaty Concerning the Cession of the Russian Possessions in North America by his Majesty the Emperor of all the Russias to the United States of America, U.S.-Russ., Mar. 30, 1867, art. 3, 15 Stat. 539, 542 (permitting inhabitants of Alaska to elect U.S. or Russian nationality); Treaty of Peace, Friendship, Limits, and Settlement, U.S.-Mex., Feb. 2, 1848, art. 8, 9 Stat. 922, 929 (similar for residents of territory Mexico ceded to the United States); *see also People ex rel. Kimberly v. De La Guerra*, 40 Cal. 311, 339–44 (1870) (discussing the right to elect between Mexican and U.S. citizenship).

[6] *See, e.g.*, Treaty of Peace Between the United States of America and the Kingdom of Spain, U.S.-Spain, Dec. 10, 1898, art. 9, 30 Stat. 1754, 1759 (providing that an election must be made "before a court of record" within a year of the Treaty's ratification); *see also* Alexander Porter Morse, *The Civil and Political Status of Inhabitants of Ceded Territories*, 14 Harv. L. Rev. 262, 263 (1900) (recognizing "the right of election … provided it be exercised and publicly recorded within a period of time indicated").

right to expatriate now recognized by Congress.[7] *TransUnion LLC v. Ramirez*, No. 20-297, slip op. at 9 (U.S. June 25, 2021).

Many of the Founding Fathers recognized the right to expatriate and disavowed the British conception of perpetual allegiance to the Crown.[8] Thomas Jefferson wrote, "I hold the right of expatriation to be inherent in every man by the laws of nature, and incapable of being rightly taken from him even by the united will of every other person in the nation." Letter from Thomas Jefferson to Albert Gallatin, June 26, 1806, *in* SAMUEL EAGLE FORMAN, THE LIFE AND WRITINGS OF THOMAS JEFFERSON 213 (1900); *see also id*. ("Congress … cannot take from the citizen his natural right of divesting himself of the character of citizen by expatriation."); Letter from Thomas Jefferson to the U.S. Minister to France (Aug. 16, 1793), *in* 6 THE WRITINGS OF THOMAS JEFFERSON 381 (Paul L. Ford ed., 1895) ("Our citizens are certainly free to divest themselves of that character by emigration, & other acts manifesting their intention, & may then become the subjects of another power."). James Madison similarly noted "[t]here can be no doubt that,

---

[7] The right of election following the Revolution is not identical to the right to expatriate. But our jurisdiction under the Constitution "does not require an exact duplicate [common law injury] in American history and tradition." *TransUnion*, No. 20-297, slip op. at 9.

[8] The dissent relies on Blackstone, a venerable authority for various common law principles. Dissenting Op. 5. Yet in the context of expatriation, the question of whether the "subject" of a "prince" can cast off his "natural allegiance," 1 W. Blackstone, *Commentaries* *358, seems to have little relevance to citizenship under the republic established by the United States Constitution, which created a government by and for the people. *Cf. TransUnion*, No. 20-297, slip op. at 9 (identifying "*American* history and tradition" as the source of rights Congress can by statute render actionable in court) (emphasis added).

on the same principle which admits of aliens being naturalized in the United States, they may afterwards cast off the character of American citizen." Letter from James Madison to Mr. Murray (June 16, 1803), *in* 3 JOHN BASSETT MOORE, A DIGEST OF INTERNATIONAL LAW 735 (1906); *see also* Leon M. Liddell, *The U.S. Position in Regard to the Right of Expatriation*, 23 Temp. L.Q. 325, 326 (1950) (explaining that "[b]oth Madison and Monroe denounced the English doctrine of perpetual allegiance").

To the extent some founding era history suggests that common law and British practice did not recognize a right to expatriate, *see* Dissenting Op. 5–6, such conception was disavowed by the time of the adoption of the Fourteenth Amendment, which altered the structure and conception of national citizenship and ushered in a "policy favoring freedom of expatriation which stands unrepealed." *Savorgnan v. United States*, 338 U.S. 491, 498–99 (1950). In 1859, for instance, the Executive Branch supported "[t]he natural right of every free person … to leave the country of his birth," finding it "incontestable" that a person possesses "the privilege of throwing off his natural allegiance and substituting another allegiance in its place." *Right of Expatriation*, 9 Op. Att'y Gen. 356, 357–58 (1859); *see also id.* at 358 ("The municipal code of England is not one of the sources from which we derive our knowledge of international law. We take it from natural reason and justice … and from the practice of civilized nations. All these are opposed to the doctrine of perpetual allegiance."). In 1868, the year the Fourteenth Amendment was ratified, the United States and China entered into the Burlingame Treaty, which recognized "the inherent and inalienable right of man to change his home and allegiance." U.S.-China, art. 5, July 28, 1868, 16 Stat. 739, 740.

The dissent's reading of history conflicts with numerous decisions of the Supreme Court and the Executive Branch, which have concluded that "[b]y 1818, … almost no one doubted the existence of the right of voluntary expatriation." *Afroyim v. Rusk*, 387 U.S. 253, 258 (1967); *see also Right of Expatriation*, 9 Op. Att'y Gen. at 359 ("[E]ver since our independence, we have upheld and maintained [the right of expatriation] by every form of words and acts."). The Court has also acknowledged that "[t]raditionally the United States has supported the right of expatriation as a natural and inherent right of all people." *Savorgnan*, 338 U.S. at 497 (citing, *inter alia*, *The Santissima Trinidad*, 20 U.S. (7 Wheat.) 283 (1822); *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64 (1804); *Talbot*, 3 U.S. 133).[9]

Consistent with a longstanding recognition by all three branches of the right to expatriate, Congress codified a statutory right to expatriate and specified a series of actions that effectuate loss of nationality. To satisfy the constitutional minimum for standing, an alleged injury must either have "'a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts,' *or* a statute must make the injury 'legally cognizable.'"

---

[9] The dissent relies on Joseph Story's commentaries, Dissenting Op. 6, but the fragment the dissent quotes is nested between important qualifiers: "It is beside the purpose of these Commentaries to enter into any consideration of [expatriation], as it does not properly belong to any constitutional inquiry. It may be stated, however, that there is no authority, which has affirmatively maintained the right, (unless provided for by the laws of the particular country[]))." 3 J. Story, *Commentaries on the Constitution of the United States* § 1099 at 3 n.2 (1833). Even on Justice Story's view, a country may provide by law for a right to expatriate, which Congress has done in the 1868 Act as well as the INA.

*Twin Rivers Paper Co. v. SEC*, 934 F.3d 607, 616 (D.C. Cir. 2019) (quoting *Spokeo*, 136 S. Ct. at 1549) (emphasis added). Here the 1868 Act and the INA identify an individual, private right to expatriate, which Farrell seeks to vindicate through his lawsuit.

Farrell properly alleges that the Department has frustrated his statutory right to expatriate. As in *Schnitzler*, we may redress this harm through a determination of the lawfulness of the Department's policy and actions. *See* 761 F.3d at 41. Farrell thus has standing and we have jurisdiction to decide his claims.

## III.

We proceed to the substance of Farrell's challenge, reviewing de novo the district court's grant of summary judgment to the Department. *See Baylor v. Mitchell Rubenstein & Assocs.*, 857 F.3d 939, 944 (D.C. Cir. 2017). We conclude that the Department may impose an in-person requirement to seek a CLN; however, the Department's application of this requirement to Farrell was arbitrary and capricious.

## A.

Farrell contends that the in-person requirement is not authorized by statute. We disagree.

While Farrell has a statutory right to expatriate, Congress has conferred substantial authority on the Secretary of State to administer naturalization laws, including laws governing the expatriation of U.S. citizens. For instance, the Secretary must approve any certificate of loss of nationality. His approval "constitute[s] a final administrative determination of loss of United States nationality under this chapter, subject to such procedures for administrative appeal as the Secretary may prescribe by regulation, and also shall constitute a denial of a right or privilege of United States nationality." 8 U.S.C.

§ 1501. The Secretary is further "charged with the administration and the enforcement of … laws relating to … the determination of nationality of a person not in the United States." *Id.* § 1104(a). The Secretary also has the authority to prescribe regulations to govern these determinations. *See id.* (The Secretary "shall establish such regulations; prescribe such forms of reports, entries and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out [these] provisions."). These grants of statutory authority include discretion to determine the forms and requirements for individuals seeking loss of nationality. A requirement that citizens attest to their loss of nationality in person lies within the wide-ranging discretion granted to the Secretary.

Moreover, the in-person requirement serves as a protection against involuntary expatriation, which the Constitution generally prohibits. *Cf.* U.S. CONST. amend. XIV. As the Supreme Court has explained, a "citizen keeps [his citizenship] unless he voluntarily relinquishes it." *Afroyim*, 387 U.S. at 262. And a voluntary act results in expatriation only with the further showing that the expatriating national "inten[ded] to terminate United States citizenship." *Vance v. Terrazas*, 444 U.S. 252, 263 (1980). Thus, citizenship cannot be lost involuntarily or accidentally. Uncertainty about whether expatriation occurred must "be resolved in favor of citizenship," *Bruni v. Dulles*, 235 F.2d 855, 856 (D.C. Cir. 1956) (per curiam), because "[r]ights of citizenship are not to be destroyed by an ambiguity," *Nishikawa v. Dulles*, 356 U.S. 129, 136 (1958) (citation omitted). *See also* 8 U.S.C. § 1481(b) ("[T]he burden shall be upon the person or party claiming that … loss occurred, to establish such claim by a preponderance of the evidence."). The in-person requirement fits comfortably within the constitutional and statutory protections against involuntary or unintentional loss of citizenship.

To resist this conclusion, Farrell argues that a consular officer has no discretion regarding whether to issue a CLN and in fact must issue a CLN "whenever" he thinks a citizen has committed an expatriating act. He relies on statutory language providing that "[w]henever a diplomatic or consular officer of the United States has reason to believe that a person … has lost his United States nationality … he shall certify the facts upon which such belief is based to the Department of State, in writing, under regulations prescribed by the Secretary of State." 8 U.S.C. § 1501. The meaning of "whenever" cannot bear the weight Farrell would place on it. If "whenever" truly meant that a CLN had to issue at any time that an officer merely "has reason to believe" that a person had lost his nationality, the CLN process could entail no procedural requirements at all. In fact, Farrell frankly argues that the statute "allows no limitation by procedure." Farrell Br. 16. But this reading runs headlong into other statutory provisions, including the requirement that a consular officer's certification of loss of nationality will take place "*under regulations prescribed by the Secretary of State.*" 8 U.S.C. § 1501 (emphasis added). Farrell would have a single word, "whenever," trump the statute's specific grant of regulatory authority to the Secretary. But we interpret statutes as a whole, not in convenient slices. *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014) (It is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.") (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)). Farrell has a statutory right to expatriate, but to obtain the government's recognition of his expatriation with a CLN, he must follow lawful regulatory procedures established by the Department.

Farrell next suggests that even if some procedural regulations are permissible, the in-person requirement is

beyond the Secretary's statutory authority. Farrell argues that because numerous other provisions in the Immigration and Nationality Act refer to an in-person appearance, the absence of such a reference in the section regarding loss of nationality means that the Department cannot impose one. Farrell Br. 19–20 (citing, among others, 8 U.S.C. § 1433(b), § 1435(c)(2)). The fact that Congress in some instances imposed an in-person requirement does not mean that the Secretary lacks discretion to impose this procedural requirement in other contexts. *See Cheney R.R. Co. v. ICC*, 902 F.2d 66, 69 (D.C. Cir. 1990) ("[I]n an administrative setting … Congress is presumed to have left to reasonable agency discretion questions that it has not directly resolved."). The negative implication Farrell presses cannot carry the day over the text and structure of the statute, which confers specific and broad regulatory authority upon the Secretary. As already discussed, the Secretary has substantial authority to administer recognition of a citizen's loss of nationality. *See* 8 U.S.C. § 1104(a); *id.* § 1501. An in-person requirement is consistent with these statutory grants of authority.

Farrell also argues that even if the Secretary has authority to impose the in-person requirement, such requirement is nonetheless ultra vires because it does not exist in any Department source. This is not so. The DS-4081, the State Department form entitled "Statement of Understanding Concerning the Consequences and Ramifications of Renunciation or Relinquishment of U.S. Nationality," contemplates this requirement. *See* Form DS-4081, https://eforms.state.gov/Forms/ds4081.pdf. A consular officer must sign the completed form, and the consular officer's signature attests that the CLN applicant "appeared personally" before the officer. *Id.* at 2. Farrell objects that this is not presented as a requirement for the CLN applicant because the "appeared personally" language appears only in the signature

block for the consular officer. Farrell's distinction makes no legal difference here—the form is required to obtain recognition of loss of nationality, and the form plainly directs the consular officer to sign only if Farrell has appeared in person. Thus, Farrell must appear in person to obtain a CLN, and the requirement that he do so is not ultra vires.

## B.

Because the Secretary may impose an in-person requirement, we next consider whether the Department's actions with respect to Farrell are arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A). The Department's letters to Farrell refusing to issue a CLN constitute an "informal adjudication" of Farrell's claims. *See Fox*, 684 F.3d at 75 (noting that a State Department letter denying a CLN was "the agency's final judgment in its informal adjudication"). Under the APA, such agency action must be the product of reasoned decisionmaking. *See generally Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983). An agency's action must be within its lawful authority, and "the process by which it reaches that result must be logical and rational." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998); *see also N.Y. Stock Exch. LLC v. SEC*, 962 F.3d 541, 554 (D.C. Cir. 2020) (same). Moreover, we cannot "supply a reasoned basis for the agency's action that the agency itself has not given." *State Farm*, 463 U.S. at 43 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). The basis for the agency's action "must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action." *Chenery*, 332 U.S. at 196–97.

Here the Department communicated multiple inconsistent requirements that Farrell must satisfy in order to obtain his certificate of loss of nationality. In its first letter, the consulate

in Switzerland advised Farrell that "he would have to come to the Embassy in Bern to sign form DS-4081 'Statement of Understanding' in person in front of a consular officer." J.A. 131. The Department's second formulation of this requirement refers, more generically, to a "signature on the required Department of State forms before a consular officer." J.A. 152. The Department's final letter, however, represents that the process for obtaining a CLN "includes the individual signing the DS-4079 before a consular officer at post abroad, and completing an interview with a consular officer to determine whether the expatriating act was performed voluntarily and with the intent to relinquish U.S. citizenship."[10] J.A. 175. But the DS-4079 contains nothing that can be read as requiring an in-person signature; only the DS-4081, with its consular attestation block that uses the phrase "appeared personally," imposes such a requirement.[11]

---

[10] Courts may review only final agency action, so "inconsistent statements by agencies' regional offices during [the] early stages of review do not [necessarily] render [the] decisionmaking process arbitrary and capricious." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 312 (D.C. Cir. 2013) (citation omitted). The district court, however, treated both the November 2016 letter to Farrell and the February 2017 letter to Farrell as constituting final agency action. *See Farrell v. Tillerson*, 315 F. Supp. 3d 47, 59–64 (D.D.C. 2018). The parties do not challenge that holding here, and finality is not a jurisdictional matter under the APA that we must decide sua sponte. *See Zhang v. U.S. Citizenship & Immigr. Servs.*, 978 F.3d 1314, 1322–23 (D.C. Cir. 2020). Therefore, both letters are properly before us.

[11] The Department unpersuasively argues that the DS-4079 also imposes an in-person requirement by advising that applicants "may sign … this statement before a Consular Officer at a U.S. Embassy or Consulate." J.A. 210. Regardless of whether the word "may"

On appeal, the Department now describes the issue as "the requirement of an in-person appearance to sign Forms DS-4079 *and* DS-4081," without mentioning any requirement of an interview. State Dep't Br. 14 (emphasis added). After pushing Farrell from pillar to post, the Department has the temerity to fault him for "conflat[ing] an in-person interview with the in-person appearance requirement." State Dep't Br. 50 (cleaned up).

While the Department has statutory discretion to impose procedural requirements such as an appearance in person, the Department has failed to adequately explain the requirements as they apply to Farrell. Nor can we supply the missing reasoning for the Department's action. *See Chenery*, 332 U.S. at 197 ("[A] court [cannot] be expected to chisel that which must be precise from what the agency has left vague and indecisive."); *Ethyl Corp. v. EPA*, 541 F.2d 1, 34 n.73 (D.C. Cir. 1976) ("Of course, [the agency's] basis must be expressed by the agency itself and not supplied by the court.").

The government's correspondence makes it impossible for Farrell to ascertain what actions he must take to obtain the certificate that the Department maintains is necessary for him to complete his expatriation.[12] The imposition of such haphazard and shape-shifting administrative requirements is the very definition of arbitrary and capricious agency action.

---

confers on the Department discretion to permit in-person signature, it certainly does not indicate an *obligation* to sign the form in person.

[12] This is not the first time we have found the Department's application of its expatriation standards wanting. *See Fox*, 684 F.3d at 78–79; *see also Schnitzler*, 761 F.3d at 35 (observing that the government denied Schnitzler a chance to renounce his citizenship "[f]or reasons [it] has failed to explain—or rather, for a host of ever-changing reasons").

*See Select Specialty Hosp.-Bloomington, Inc. v. Burwell*, 757 F.3d 308, 314 (D.C. Cir. 2014) (remanding, despite "hav[ing] no reason to doubt the Secretary's authority," because even after the agency's "decision, the district court's opinion, the Government's briefs on appeal, and oral argument, we still cannot discern precisely what the [agency's] decisional standard was"); *Fox*, 684 F.3d at 75 ("[N]o deference is owed to an agency action … where the agency's explanation for its action lacks any coherence.") (cleaned up).

Because we find the Department's decision arbitrary and capricious, we remand to the Department to reconsider Farrell's request for a CLN. *See Fox*, 684 F.3d at 80 (finding denial of a CLN to be arbitrary and capricious, but explaining that "[t]he Department, not the court, has the authority … to act in the first instance to address [expatriation] matters …. We will therefore pursue a course of prudence … and remand the case"). Nothing in this decision should be interpreted to foreclose the Department from denying Farrell's request upon reconsideration; however, if it follows that path, it must explain why it is denying the request and what precise steps Farrell must take to obtain recognition of his loss of nationality.

\* \* \*

For the foregoing reasons, we reverse the district court's grant of summary judgment to the Department and remand to the district court with instructions to remand to the Department to reconsider Farrell's request for a certificate of loss of nationality.

*So ordered.*

KATSAS, *Circuit Judge*, dissenting: By his own account, Gerald Farrell gave up his United States citizenship nearly two decades ago. Farrell is now a Swiss citizen living in Switzerland. In this appeal, he seeks to compel the Department of State to certify that he is no longer a citizen. Farrell claims a statutory right to this certification, but he does not explain why the government's refusal to issue it threatens him with any concrete injury. Accordingly, I would dismiss the appeal for lack of a case or controversy.

I

The Immigration and Nationality Act provides that a United States national "shall lose his nationality by voluntarily performing" any of eight enumerated acts "with the intention of relinquishing United States nationality." 8 U.S.C. § 1481(a). One of these acts is "obtaining naturalization in a foreign state." *Id.* § 1481(a)(1). Others include declaring allegiance to a foreign state, renouncing nationality before a consular officer, and committing treason against the United States. *Id.* § 1481(a).

The INA establishes an administrative process for the Secretary of State to certify that a person "has lost his United States nationality." 8 U.S.C. § 1501. If a consular officer has "reason to believe" that someone has done so, the officer "shall certify the facts upon which such belief is based to the Department of State." *Id.* If the Secretary of State approves the certification, the Department then must issue a certificate of loss of nationality (CLN), which is a "final administrative determination of loss of United States nationality." *Id.* A person inside the United States may obtain judicial review of a CLN by filing an action "for a judgment declaring him to be a national of the United States." *Id.* § 1503(a). A person outside the United States may seek judicial review by applying for a certificate of identity to enter the United States, *id.* § 1503(b), and then filing a declaratory-judgment action, *id.* § 1503(a).

The INA authorizes the Secretary of State to establish regulations, prescribe forms, and issue instructions to carry out his responsibilities under the statute. 8 U.S.C. § 1104(a). Under this authority, the State Department's *Foreign Affairs Manual* prohibits the issuance of a CLN unless the affected individual appears personally at an embassy or consulate to fill out various forms documenting how he lost his citizenship.

## II

Farrell currently has no ties with the United States. In 1994, he moved from the United States to Switzerland. In 2004, he obtained Swiss naturalization with the intent of relinquishing his United States nationality, and he thereby gave up the latter. His wife and daughter are Swiss. According to Farrell's complaint, his "personal and cultural identity are Swiss," and his "friends, immediate family, work history, and future are all in Switzerland." J.A. 17.

Since he obtained Swiss naturalization, Farrell's only contact with the United States has been involuntary. In 2013, Farrell was arrested in Spain and extradited to the United States for crimes committed before 2004. Farrell pleaded guilty and was sentenced to 96 months of imprisonment in the United States. While incarcerated, he sought to complete his sentence in Switzerland. To facilitate a transfer of custody to Switzerland, Farrell requested a CLN from the State Department, which declined to provide it unless Farrell appeared at an embassy to complete the necessary paperwork.

Farrell then sued to compel the Department to recognize his loss of nationality. He sought to set aside its denials of a CLN, as well as a declaratory judgment that he is no longer a citizen. On summary judgment, the district court held that the Department had permissibly refused to issue a CLN and that declaratory relief was inappropriate. While this appeal was

pending, Farrell completed his sentence and returned to Switzerland.

At oral argument, we probed whether these recent events had mooted Farrell's appeal. We specifically asked whether Farrell feared any future entanglement with the United States. Through counsel, Farrell declined to identify any tangible consequence stemming from the denial of a CLN. Instead, Farrell argued that because the INA required the State Department to process and issue him a CLN, its refusal to do so inflicted an Article III injury.

## III

Article III of the Constitution restricts the federal judicial power to live "Cases" or "Controversies." U.S. Const. art. III, § 2. "No principle is more fundamental to the judiciary's proper role in our system of government" than this limit on our jurisdiction, *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (cleaned up), which includes the related doctrines of standing and mootness, *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90–91 (2013). To establish standing, the plaintiff must prove an injury in fact that was caused by the defendant and would likely be redressed by a favorable decision. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The injury must be concrete, particularized, and actual or imminent. *Id.* at 1548. The case-or-controversy requirement "subsists through all stages of federal judicial proceedings," *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (cleaned up), so a dispute "becomes moot—and therefore no longer a Case or Controversy for purposes of Article III—when the issues presented are no longer live," *Already*, 568 U.S. at 91 (cleaned up).

In this case, Farrell alleges no ongoing injury from the State Department's refusal to issue him a CLN. His desire to serve the remainder of his prison sentence in Switzerland no

longer establishes a live controversy, as he has completed the sentence and now lives freely in Switzerland. Nor does Farrell allege any other actual or imminent injury from not having a CLN in-hand. In particular, he alleges no further criminal exposure and no other United States law that might apply to him as a putative citizen living abroad, much less any possibility that the government will attempt to enforce any such law against him in the future. Similarly, Farrell does not allege that Switzerland will treat him any differently depending on whether he can procure a CLN from his former country.

Instead, Farrell alleges only one theory of Article III standing: The INA gives him statutory rights to have the State Department process and issue a CLN, so its refusal to do so concretely injures him. But Congress "cannot erase Article III's standing requirements" by authorizing suits to redress injuries that are abstract as opposed to concrete. *Spokeo*, 136 S. Ct. at 1548 (quoting *Raines*, 521 U.S. at 820 n.3); *see Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("deprivation of a procedural right without some concrete interest that is affected by the deprivation … is insufficient to create Article III standing"). Rather, "Article III standing requires a concrete injury even in the context of a statutory violation," *Spokeo*, 136 S. Ct. at 1549, and "[t]he concreteness component of injury in fact sharply limits when a plaintiff can establish standing based solely on a violation of his statutory rights," *Jeffries v. Volume Servs. Am., Inc.*, 928 F.3d 1059, 1063 (D.C. Cir. 2019). "Congress's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm." *TransUnion LLC v. Ramirez*, No. 20-297, slip op. at 10 (U.S. June 25, 2021); *see also Frank v. Autovest, LLC*, 961 F.3d 1185, 1187–90 (D.C. Cir. 2020); *Owner-Operator Indep. Drivers Ass'n v. DOT*, 879 F.3d 339, 342–47 (D.C. Cir. 2018).

In determining which intangible harms qualify as concrete injuries, we consider both history and the judgment of Congress. History matters because the case-or-controversy requirement "is grounded in historical practice," *Spokeo*, 136 S. Ct. at 1549, so we ask whether an alleged injury "has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts," *TransUnion*, slip op. at 9 (cleaned up). Congress matters because it is "well positioned" to make factual judgments bearing on our assessment of concreteness. *Spokeo*, 136 S. Ct. at 1549. Yet the requirement of a concrete injury remains part of "the irreducible constitutional minimum of standing." *Lujan v. Def's of Wildlife*, 504 U.S. 555, 560 (1992). Article III courts therefore "must ultimately decide what injuries qualify as concrete," and "Congress's judgment may inform that assessment but cannot control it." *Trichell v. Midland Credit Mgmt.*, 964 F.3d 990, 999 (11th Cir. 2020); *see TransUnion*, slip op. at 10. So in this case, Farrell cannot satisfy Article III simply by proving that the State Department erroneously denied him a CLN. Instead, he must show that the denial threatens him with an injury that meets Article III standards of concreteness, as informed by history and the judgment of Congress.

History cuts strongly against Farrell's standing. At common law, there was nothing resembling a cause of action to compel sovereign recognition of expatriation, because there was no common-law right to expatriate. Before the American Revolution, it was "a principle of universal law that the natural-born subject of one prince [could not], by any act of his own, . . . put off or discharge his natural allegiance to the former." 1 W. Blackstone, *Commentaries* \*358; *see also* Calvin's Case (1608) 77 Eng. Rep. 377, 407; 7 Co. Rep. 1a, 25a (Lord Coke CJ). The traditional view became controversial in the wake of the Revolution, *see* Morrow, *The Early American Attitude*

*Toward the Doctrine of Expatriation*, 26 Am. J. Int'l L. 552 (1932), but "[t]he courts, and most authoritative jurists, repeatedly expressed the opinion that the United States had inherited, as part of the common law, the English doctrine with regard to the change of allegiance," J.B. Moore, *Principles of American Diplomacy* 273–74 (1918). As Justice Story explained, the Supreme Court adhered to the view that "no persons can by any act of their own, without the consent of the government, put off their allegiance, and become aliens." *Shanks v. Dupont*, 28 U.S. (3 Pet.) 242, 246 (1830); *see also*, *e.g.*, 3 J. Story, *Commentaries on the Constitution of the United States* § 1099 at 3 n.2 (1833) ("there is no authority, which has affirmatively maintained the right" to expatriate absent Congress's consent, "and there is a very strong current of reasoning on the other side"); 2 J. Kent, *Commentaries on American Law* 42 (1st ed. 1827) ("a citizen cannot renounce his allegiance to the United States without the permission of government, to be declared by law"). When Congress finally "gave its consent" to expatriation in the Citizenship Act of 1907, courts began to recognize it "upon the specific terms stated" by Congress, consistent with the "common-law prohibition of expatriation without the consent of the sovereign." *Savorgnan v. United States*, 338 U.S. 491, 498 (1950). In sum, a common-law suit to expatriate would have been antithetical to traditional principles of sovereignty and citizenship, which conditioned the right on congressional consent. Unsurprisingly, then, there is no common-law analog to a suit compelling the sovereign to recognize an expatriation.

My colleagues note that some of the Framers supported the right to expatriate, which Congress, the Executive Branch, and one post-*Shanks* state court later embraced. *Ante* at 13–17. These points do not bear on the historical inquiry under *Spokeo* and *TransUnion*, which considers not whether plaintiffs had a private or natural right, but whether the alleged injury "has a

close relationship to a harm traditionally recognized as providing a *basis for a lawsuit* in American courts." *TransUnion*, slip op. at 9 (emphasis added) (cleaned up); *see id.* at 11 ("under Article III, an injury in law is not an injury in fact"). Early in our history, the Supreme Court held that there was no cause of action to expatriate without the consent of Congress, *Shanks*, 28 U.S. (3 Pet.) at 246, a view that led federal courts to abstain from adjudicating expatriations until Congress provided for it by statute, *see Savorgnan*, 338 U.S. at 497–98.

The only common-law analog that my colleagues offer to support standing is the "right of election," a doctrine that gave British subjects a limited time to choose between "the American cause" and continued allegiance to Great Britain. *M'Ilvaine v. Coxe's Lessee*, 8 U.S. (4 Cranch) 209, 212 (1808). Quoting from a solo dissent, my colleagues say that courts expounded on the right of election even without statutory authorization. *Ante* at 13–14 (quoting *Inglis v. Trustees of Sailor's Snug Harbour*, 28 U.S. (3 Pet.) 99, 124 (1830) (Story, J., dissenting)). But no court ever treated election, much less recognition of election, as itself the "basis for a lawsuit." *TransUnion*, slip op. at 9 (cleaned up). Like expatriation under the INA, election happened automatically—without any need to sue for permission or executive recognition. Courts involved themselves only after-the-fact, if a suit under a traditional cause of action happened to turn on whether an individual had elected to remain a British subject—as, for example, in adjudicating property claims under the Jay Treaty, *M'Ilvaine*, 8 U.S. (4 Cranch) at 215, or a will, *Inglis*, 28 U.S. (3 Pet.) at 126. Moreover, an election doctrine was necessary precisely because individuals had no common-law right to expatriate at any time without sovereign consent, which would have obviated the need for a special transitional rule to govern in the wake of a Revolution. Not surprisingly, then, the very election

decisions cited by my colleagues confirm that there was no common-law right to expatriate. *Inglis*, 28 U.S. (3 Pet.) at 125 (majority) ("The government may release the governed from their allegiance."); *M'Ilvaine*, 8 U.S. (4 Cranch) at 212–13 (individual who did not timely exercise the right of election was "bound to [his] government" and could not renounce citizenship); *see also Inglis*, 28 U.S. (3 Pet.) at 156 (Story, J., dissenting) ("The general principle of the common law also is, that the allegiance thus due by birth, cannot be dissolved by any act of the subject.").

In sum, my colleagues have identified no historical evidence to question the "common-law prohibition of expatriation without the consent of the sovereign." *Savorgnan*, 338 U.S. at 498. And there is no evidence that compelling executive recognition of expatriation was a traditional "basis for a lawsuit." *TransUnion*, slip op. at 9 (cleaned up).

More broadly, there is no historical pedigree for courts to declare legal rights or status in the abstract. To the contrary, "the oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions." *Pub. Serv. Elec. & Gas Co. v. FERC*, 783 F.3d 1270, 1274 (D.C. Cir. 2015) (cleaned up); *see, e.g.*, *Muskrat v. United States*, 219 U.S. 346, 362 (1911). Accordingly, the Supreme Court has long held that a plaintiff seeking declaratory relief must have "a real, not a hypothetical, controversy" to satisfy Article III. *Nashville, Chattanooga & St. Louis Ry. Co. v. Wallace*, 288 U.S. 249, 264 (1933). In other words, a declaratory-judgment plaintiff cannot rest on an abstract desire to know his rights or status. *See, e.g.*, *Ashcroft v. Mattis*, 431 U.S. 171, 172 (1977); *Golden v. Zwickler*, 394 U.S. 103, 109 (1969). Instead, he must connect the declaration to a concrete injury, such as the threatened enforcement of an allegedly unconstitutional statute, *Steffel v. Thompson*, 415

U.S. 452, 459 (1974), or an allegedly invalid patent, *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 137 (2007); *see also California v. Texas*, 141 S. Ct. 2104, 2114 (2021) ("our cases have consistently spoken of the need to assert an injury that is the result of a statute's actual or threatened *enforcement*, whether today or in the future").

The judgment of Congress also cuts against Farrell. Although the INA confers a statutory right to expatriate, it establishes no process for individuals to request CLNs. Instead, it imposes reporting requirements on consular officers "[w]henever" they suspect that a person "has lost his United States nationality" while abroad, regardless of whether that person wishes to receive a CLN. 8 U.S.C. § 1501. The Secretary of State then has the "discretion," but not the duty, to approve the CLN. *Lozada Colon v. U.S. Dep't of State*, 170 F.3d 191, 191 (D.C. Cir. 1999) (per curiam). At most, an individual wishing to obtain a CLN can seek to jump-start the process by committing an expatriating act and bringing it to the attention of a consular officer. But the INA provides neither a substantive entitlement to a CLN nor even a process entitling individuals to seek one. Instead, the CLN process is only a discretionary administrative mechanism for the State Department to declare a past expatriation. And absent any "legal rights" to a CLN, the denial of a CLN cannot be an "invasion" of legal rights for standing purposes. *Owner-Operator Indep. Drivers*, 879 F.3d at 345 (cleaned up).

Furthermore, the INA treats a CLN's issuance, but not its denial, as an injury to the affected individual. The INA provides that the approval of a CLN constitutes "a denial of a right or privilege of United States nationality," 8 U.S.C. § 1501, and it allows CLN recipients in the United States to seek a declaration of United States nationality, *id.* § 1503(a). Likewise, it allows CLN recipients outside the United States to

seek admission into the United States, *id.* § 1503(b), and then to seek a declaratory judgment, *id.* § 1503(a).  Congress thus viewed the *approval* of a CLN as an injury concrete enough to confer Article III standing.  But the INA contains no provisions affording review for the *denial* of a CLN, which strongly suggests that Congress did not seek to "identify" and "elevate" CLN denials as comparable injuries.  *Spokeo*, 136 S. Ct. at 1549 (cleaned up).

The availability of judicial review under the Administrative Procedure Act does not change this analysis. When considering congressional judgments about which intangible harms satisfy Article III, we focus on findings targeted to specific harms.  *See, e.g.*, *Trichell*, 964 F.3d at 998–99; *Jeffries*, 928 F.3d at 1065.  On the other hand, the mere existence of a cause of action, even in the specific substantive statute at issue, "does not affect the Article III standing analysis."  *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1620 (2020).  In affording judicial review to any person "aggrieved by agency action," 5 U.S.C. § 702, the APA simply provides redress for harms that qualify as injury in fact, *see Air Courier Conf. of Am. v. Am. Postal Workers Union*, 498 U.S. 517, 523 (1991).  It reflects no congressional judgment about which harms qualify, much less about whether the denial of a CLN qualifies.

Farrell also invoked the Declaratory Judgment Act, 28 U.S.C. § 2201.  It is unclear whether that Act even applies here. As noted above, the INA provides that a person receiving a CLN "may institute an action under the provisions of section 2201 . . . for a judgment declaring him to be a national of the United States," 8 U.S.C. § 1503(a), but it makes no similar provision for a person *denied* a CLN to seek a declaration of *non*-citizenship.  In any event, the Declaratory Judgment Act affords an omnibus cause of action comparably general to that

in the APA. In permitting courts to declare the rights of parties "[i]n a case of actual controversy," 28 U.S.C. § 2201(a), the Act does not, and could not, relax the case-or-controversy requirement. *See*, *e.g.*, *MedImmune*, 549 U.S. at 127; *Aetna Life Ins. Co. of Hartford v. Haworth*, 300 U.S. 227, 240 (1937). Nor does it reflect any congressional judgment about whether any specific injuries are concrete for Article III purposes, much less about whether the denial of a CLN is such an injury.

In sum, there is no historical, statutory, or other basis to treat the denial of a CLN as a concrete Article III injury.

IV

My colleagues view this case as involving harm to Farrell's "statutory right to expatriate." *Ante* at 6. At one point, they maintain that Farrell "remains a citizen until the government recognizes that he has expatriated." *Id.* at 10. At various other points, they contend that Farrell suffers a concrete injury merely because the government has taken the position that he remains a citizen. They therefore assert that "the central issue is the right to expatriate," not "whether Farrell has a right to a CLN." *Id.* at 11. And they characterize a CLN as "inextricably bound with expatriation." *Id.* at 10.

To begin, my colleagues press theories that Farrell himself has disclaimed. Farrell asserts that "[h]is expatriation took place long ago" and that he therefore "is no longer a U.S. citizen." Blue Br. 35. He claims that "[t]he dispute is whether the Department can arbitrarily refuse to consider his request for a CLN." *Id.* And he sees a CLN not as a necessary step to expatriate but as a government "benefit," the denial of which is enough to establish standing. Oral Arg. Tr. at 9. In short, Farrell's position is that "the injury is the refusal to process the Certificate of Loss of Nationality, period." *Id.* at 6. My colleagues thus press a theory of standing that Farrell does not,

despite the settled rule that arguments supporting jurisdiction may be forfeited. *See Int'l Longshore & Warehouse Union v. NLRB*, 971 F.3d 356, 363 (D.C. Cir. 2020). Likewise, they assume the defendant's theory of the case for purposes of standing, despite the settled rule that we must assume the plaintiff's merits theory. *See Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007).

In any event, executive recognition is neither legally nor practically necessary to expatriate. By its terms, the INA provides that a United States national "shall lose his nationality by voluntarily performing" an expatriating act "with the intention of relinquishing United States nationality." 8 U.S.C. § 1481(a). And the specific expatriating act that Farrell insists he performed in 2004—applying for and obtaining Swiss naturalization in Switzerland as an adult—requires no action by the federal executive at all, much less advance recognition to make it effective. *See id.* § 1481(a)(1). For such expatriating acts, citizenship is "lost automatically, without any administrative or judicial determination." *United States v. Yakou*, 428 F.3d 241, 249 (D.C. Cir. 2005).

The INA also sharply distinguishes between expatriation and recognition. As explained above, it establishes the CLN process as an administrative mechanism for the State Department to determine after-the-fact whether a person "has lost" his United States nationality. 8 U.S.C. § 1501. The INA also makes clear that a past expatriation may be adjudicated and thus recognized after-the-fact whenever the question is "put in issue in any action or proceeding" under the INA "or any other Act." 8 U.S.C. § 1481(b). In various contexts, courts and agencies adjudicate whether alleged expatriations have occurred. *See, e.g.*, *Breyer v. Ashcroft*, 350 F.3d 327, 333 (3d Cir. 2003) (removal); *Action S.A. v. Marc Rich & Co.*, 951 F.2d 504, 506–07 (2d Cir. 1991) (diversity-of-citizenship

jurisdiction); *In re Davis*, 16 I. & N. Dec. 514, 526 (BIA 1978) (removal). The INA thus makes clear that expatriation and recognition are distinct; that the right to expatriate does not include a right to executive or judicial recognition; and that the CLN process is only one among many possible mechanisms for adjudicating a past expatriation as necessary.

Statutory history confirms these points. In the 45 years from 1907 to 1952, federal law permitted expatriation but afforded no CLN or other formal administrative mechanism for its adjudication. *See* Act of Mar. 2, 1907, ch. 2534, 34 Stat. 1228; Nationality Act of 1940, ch. 876, 54 Stat. 1137. Yet individuals nonetheless expatriated without government recognition. *See Lapides v. Clark*, 176 F.2d 619, 621 (D.C. Cir. 1949) ("No judicial proceedings were necessary to bring about [expatriation]. It followed by virtue of the statute which took effect merely through residence abroad and lapse of time." (cleaned up)). And recognition occurred only when the question of a past expatriation was placed at issue in a judicial or executive adjudication. *See, e.g.*, *Perkins v. Elg*, 307 U.S. 325, 343–44 (1939) (deportation); *Mackenzie v. Hare*, 239 U.S. 299, 306, 311–12 (1915) (voter registration); Citizenship of Ingrid Therese Tobiassen, 36 Op. Atty's Gen. 535, 540 (1932) (passport application).

My colleagues reason that recognition is "inextricably bound" to expatriation because "citizenship is a reciprocal relationship between a person and the state." *Ante* at 10. I agree that citizenship is a reciprocal relationship, which is why "the consent of the government" is necessary to expatriate. *See Shanks*, 28 U.S. (3 Pet.) at 246. But for centuries, that consent has turned on *legislative* recognition. *See, e.g.*, *Savorgnan*, 338 U.S. at 498; *Inglis*, 28 U.S. (3 Pet.) at 125; *M'Ilvaine*, 8 U.S. (4 Cranch) at 212 (Cushing, J.); *Talbot v. Janson*, 3 U.S. (3 Dall.) 133, 162–64 (1795) (opinion of Iredell, J.); Expatriation, 14

Op. Atty's Gen. 295, 296 (1873); 3 J. Story, *Commentaries*, *supra*, § 1099 at 3 n.2. And rather than categorically delegating that authority to the Executive Branch, Congress has given its consent through the INA, which permits expatriation without executive approval.

My colleagues fall back to the position that even if expatriation and recognition are distinct, the State Department has linked them through its litigating position that Farrell "remains a citizen" unless and until it issues him a CLN. *Ante* at 6. But as explained above, Farrell has taken the opposite position, which we must accept in assessing his standing. In any event, the INA makes clear that expatriation does not require executive recognition, as the State Department's own official manual confirms. *See* 7 *Foreign Affairs Manual* § 1228.5 (2014) ("The effective date of loss of nationality is the date of the expatriating act, not the date the CLN is approved."). Because Farrell has already expatriated, I cannot agree that the Department's position amounts to the "refusal to allow the expatriation to occur on the terms provided by Congress." *Ante* at 11. Moreover, the government's mistaken view of Farrell's legal status is not enough to confer standing absent any threat that the government will seek to enforce some law against Farrell. *See California v. Texas*, 141 S. Ct. at 2114.

My colleagues say that the Department's position must have tangible consequences for Farrell, but they identify none. Their only example is that Farrell's "claimed expatriation" did not prevent the government from extraditing and convicting Farrell for offenses that he committed in the United States. *Ante* at 12. But none of that turned on Farrell's citizenship status: The governing criminal statutes apply to citizens and aliens alike. 18 U.S.C. §§ 2423(a), 2252(a)(4). So too does the treaty under which Farrell was extradited. Treaty on Extradition, U.S.-Spain, May 29, 1970, 22 U.S.T. 737, 738. In

any event, Farrell alleges no prospective criminal exposure, much less exposure that would turn on whether the United States views Farrell as still a citizen. To reiterate, he contends that "the injury is the refusal to process the Certificate of Loss of Nationality, period." Oral Arg. Tr. at 6.

Finally, my colleagues invoke *Schnitzler v. United States*, 761 F.3d 33 (D.C. Cir. 2014), which seems to me inapposite. *Schnitzler* involved an American citizen who could not expatriate because of his incarceration. *Id.* at 35. Although Schnitzler sought both expatriation and its official recognition, we never suggested that the absence of recognition is what injured him concretely. Instead, we construed his alleged injury as the inability to expatriate, and we held that injury sufficient to confer Article III standing. *See, e.g., id.* ("Schnitzler has standing because he *remains a citizen* against his wishes and allegedly in violation of his constitutional rights." (emphasis added)); *id.* at 40 ("Schnitzler has sufficiently alleged an injury in fact: to wit, being required to *continue his association* with the United States against his wishes . . . . Schnitzler regards himself as 'injured' by his *inability to renounce* [citizenship]." (emphases added)). *Schnitzler* thus has little to say about Farrell, who claims to have committed his expatriating act long ago, who currently has no association with the United States, and who has no explanation for why official recognition of his past expatriation matters to him going forward.

To recast *Schnitzler* as a case about recognition, my colleagues point to language in Schnitzler's pro-se complaint that they read as suggesting a past expatriation. *Ante* at 8. But we rejected that reading and instead concluded that Schnitzler "genuinely believe[d]" that he "remained in citizenship status." 761 F.3d at 40. Because it was undisputed that Schnitzler, unlike Farrell, had had been unable to perform an expatriating

act, we concluded that "Schnitzler is an American citizen." *Id.* at 35; *see also id.* ("Schnitzler remains a citizen . . . .").[1] And although my colleagues are correct that we "repeatedly cited" Schnitzler's request for recognition, *ante* at 9 n.1, none of those citations are in our discussion of injury-in-fact. We instead premised our standing discussion entirely on the premise that Schnitzler "remain[ed] a citizen against his wishes." *Id.* at 35. *Schnitzler* does not hint that the right to expatriate includes a right to executive recognition, much less that the refusal of such recognition would confer Article III standing.

In sum, my colleagues conflate the statutory right to expatriate with executive recognition of a past expatriation. This approach is inconsistent with the INA's unambiguous text, longstanding historical practice, and Farrell's own theory of injury, each of which treats the two as different.

V

Farrell claims to have expatriated in 2004, over a decade and a half ago, by obtaining naturalization in Switzerland with the intent of relinquishing his United States nationality. And while Farrell sought recognition of his expatriation to facilitate a transfer of custody from the United States to Switzerland, he does not explain why a CLN would matter to him now that his sentence has expired and he is living as a free man and a Swiss citizen in Switzerland. Because Farrell has not shown any ongoing concrete injury from the denial of a CLN, I would dismiss his appeal for lack of a case or controversy.

---

[1] Under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), we could not have credited the erroneous legal conclusion that Schnitzler had expatriated despite having performed no expatriating act. *See id.* at 678; 8 U.S.C. § 1481(a).